# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JOHN GNUTEK, | |
| Plaintiff, | |
| v. | Case No. 17-cv-00808 |
| ILLINOIS GAMING BOARD, MARK OSTROWSKI, KAREN WEATHERS, and VINCENT PATTARA | Judge Martha M. Pacold |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Gnutek was formerly employed as a Gaming Senior Special Agent at the Illinois Gaming Board (IGB) and was terminated in 2015. Gnutek filed this wrongful termination case against the IGB and individual defendants Mark Ostrowski, Karen Weathers, Isaiah D. Vega, Vincent Pattara, and Clinton C. Cobb. Gnutek brought claims for retaliation in violation of Title VII (Count I), retaliation in violation of the First Amendment and 42 U.S.C. § 1983 (Count II), and violation of the Illinois Ethics Act (Count III).

The district court dismissed the Illinois Ethics Act claim (Count III) against the IGB and individual defendants in their official capacities and denied the motion to dismiss in all other respects. [21]. After discovery, Gnutek voluntarily dismissed individual defendants Cobb and Vega. [31], [33].

The remaining defendants (the IGB and individual defendants Ostrowski, Weathers, and Pattara) now seek summary judgment on the remaining claims. [37]. For the reasons below, defendants' motion is granted.

## BACKGROUND

The following facts are undisputed unless otherwise noted and are taken from the pleadings (to the extent the answer admits the allegations of the complaint), the parties' Local Rule 56.1 statements, and filings in prior cases in this court and in the Central District of Illinois (to the extent raised by the parties and either undisputed or proper for judicial notice). The facts are viewed in the light most favorable to Gnutek, the nonmovant. *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

# I.     Factual Allegations

## A.     The Parties

Plaintiff John Gnutek was formerly employed by defendant IGB as a Gaming Senior Special Agent. [25] ¶ 5.[1]

The IGB is an Illinois state agency that enforces certain gaming laws in the state, including by regulating riverboat gambling (casinos) and video gaming. *Id.* ¶ 6.

Gnutek began his employment with the IGB in 1999 as a Revenue Special Agent Trainee. *Id.* ¶ 12. Throughout the course of his employment with the IGB, he also held the following different positions: Revenue Special Agent, Revenue Senior Special Agent, and ultimately Gaming Senior Special Agent. *Id.* (Gnutek was initially employed by the Illinois Department of Revenue. At some point, Gnutek, like a number of other employees of the Department of Revenue, was reclassified as an employee of the IGB.)

As a Gaming Senior Special Agent, Gnutek "was an armed peace officer and had daily interactions with members of the public while performing his investigations and law enforcement duties, which included performing regulatory tasks such as internal audits and investigations, coordinating surveillance, monitoring employees and the public for illegal activities like card counting, making arrests, performing criminal investigations of the staff and members of the public, processing and booking arrestees, and appearing in court." [42] at 6 ¶ 12.

All but one of the individual defendants were in Gnutek's chain of command, as follows:

At all relevant times, defendant Mark Ostrowski was the Administrator of the IGB. *Id.* at 2–3 ¶ 4. (He has since left employment with the IGB. *Id.*)

Illinois State Police (ISP) Lt. Col. Isaiah D. Vega (former defendant who was voluntarily dismissed) served as Deputy Administrator of Enforcement for the IGB while employed by the ISP from April 2014 to June 2015; Vega reported to Ostrowski. [25] at 3 ¶ 9.

Defendant Vincent Pattara worked for the IGB from 1990 until his retirement in June 2016. [42] at 2 ¶ 3. From approximately 2012 through 2014, Pattara worked as a docksite supervisor and then worked as an operations

---

[1] Bracketed numbers refer to docket entries and are followed by the page or paragraph number. Page numbers refer to the CM/ECF page number.

supervisor until he retired in 2016.  *Id*.  Pattara reported to Vega from April 2014 to June 2015.  [25] at 3 ¶ 10.

ISP Sgt. Clinton C. Cobb (former defendant who was voluntarily dismissed) performed duties for the IGB while employed by the ISP beginning in 2010.  *Id*. at 4 ¶ 11.  Cobb served as Acting Casino Enforcement Supervisor for the Hollywood Casino in Joliet from August 2013 until the fall of 2016.  *Id*.  Cobb reported to Pattara from April 29, 2014, to June 19, 2014.  Gnutek directly reported to Cobb "only from the time [Gnutek] returned from his suspension until his termination." *Id*.[2]

Karen Weathers—the only defendant not in Gnutek's chain of command— worked for the IGB as its equal employment opportunity officer from May 2011 through December 2016.  [42] at 2 ¶ 2.

## B.    Gnutek's Prior Lawsuits against the IGB

In support of the retaliation claims in this case, Gnutek relies on his substantial prior litigation history, which involved both the IGB itself and at least two of the current individual defendants and alleged corruption in IGB personnel decisions.  The litigation history is described in more detail below—but in short:

- As the prior judge described it, it is "a history of acrimonious litigation," involving three federal lawsuits (two in this district and one in the Central District of Illinois), an appeal to the Seventh Circuit, and state court litigation.  [21] at 4.

- All of this litigation was against the IGB itself.

- At least two of the current individual defendants were also involved: One of the current individual defendants, Ostrowski (the IGB Administrator), was named as a defendant in one of the cases, and another current individual defendant, Pattara, was involved in the underlying events that were the subject of litigation.

- The prior federal lawsuits involved allegations (or proposed allegations) of corruption in IGB personnel decisions, as well as allegations of retaliation by the IGB and its personnel for protected activity.

The specific lawsuits are as follows:

---

[2] The parties do not clarify exactly what time period this refers to.

## 1.    *Gnutek I*

On June 30, 2006, Gnutek filed a lawsuit against the IGB in the Northern District of Illinois, alleging retaliation under Title VII. (*Gnutek v. IGB*, No. 06-cv-3561 (N.D. Ill.) ("*Gnutek I*")). [42] at 3 ¶ 5. Specifically, Gnutek alleged that, because in 2004 he had complained of gender discrimination, he had not received a position posted in 2005 for which he was the most qualified candidate. [38-6] at 5–7. The position was enforcement operations supervisor.

The Seventh Circuit described *Gnutek I* as follows (in connection with a later retaliation case by Thomas Hobgood, another IGB employee who assisted Gnutek with the litigation): "After he had worked at the Gaming Board for a couple of years, Hobgood applied to become an enforcement operations supervisor. Many others, including Gnutek (who worked then for the enforcement division of the Board), also sought the position. From this pool of applicants the Board selected Mark Stevens, a master sergeant with the Illinois State Police, in 2005. Some employees felt that Stevens's selection reflected the Gaming Board's favoritism toward the State Police. Gnutek thought the selection process was unlawful. He sued the Gaming Board the following year, alleging that it denied him the position of enforcement operations supervisor in retaliation for an earlier gender bias suit." *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 637–38 (7th Cir. 2013).

As originally filed on June 30, 2006, the *Gnutek I* complaint included only a Title VII retaliation claim and named only the IGB. However, on November 3, 2006, Gnutek moved to file an amended complaint. The proposed amended complaint added a second count under RICO against two new defendants, William Cellini (a prominent business person) and Alonzo Monk (deputy campaign manager to then-Governor Rod Blagojevich and former Deputy Chief of Staff to Blagojevich). [42] at 3 ¶ 5; [38-6]. The proposed RICO claim alleged among other things that Blagojevich, in exchange for financial and political support, allowed Cellini control over ISP and IGB personnel decisions and placements on the Board of the Teachers Retirement System, and that Monk and Blagojevich were both instrumental in following through on these agreements. [38-6].

On November 16, 2006, the district court denied Gnutek's motion to amend to add the RICO count against Cellini and Monk. *Gnutek I*, No. 06-cv-3561 (N.D. Ill.), Dkt. 21.

Gnutek then voluntarily dismissed the case (*Gnutek I*, in the Northern District of Illinois) on December 20, 2006 (*Gnutek I*, No. 06-cv-3561 (N.D. Ill.), Dkt. 22)—but shortly afterward, on December 29, 2006, refiled the RICO claim as a freestanding lawsuit in the Central District of Illinois (*Gnutek II*, discussed below). [42] at 3–4 ¶¶ 5–6.

None of the individual defendants in the current action was named in *Gnutek I* or otherwise identified in the complaint or the proposed amended complaint. Nonetheless, Gnutek contends that while the proposed amended complaint did not specifically reference the individual defendants named in this case, the proposed amended complaint not only concerned Gnutek's specific situation but also alleged improper control by Cellini over IGB personnel decisions (in exchange for Cellini's financial and political support for Blagojevich), that Gnutek's RICO lawsuit (proposed in *Gnutek I* and filed in *Gnutek II*) received substantial publicity, and that the *Gnutek/Hobgood* litigation (discussed below) focused largely on why the IGB would have a motive to retaliate against Gnutek (and his colleague Hobgood). [42] at 3–4 ¶ 6.

## 2.    *Gnutek II*

As noted above, on December 29, 2006, Gnutek filed a second lawsuit in the Central District of Illinois, *Gnutek v. Cellini*, 07-cv-2109 (C.D. Ill.) ("*Gnutek II*"). [42] at 3 ¶ 6. This lawsuit alleged the RICO claim against Cellini and Monk that Gnutek had unsuccessfully sought to add in *Gnutek I*. *Id*. As discussed above, none of the defendants in the current action were named as defendants in *Gnutek II*, but Gnutek contends that regardless, given the nature of the allegations, the lawsuit gave the IGB and its personnel a retaliatory motive. *Id*.

Gnutek voluntarily dismissed *Gnutek II* on July 10, 2014. *Id*.[3]

## 3.    *Gnutek/Hobgood*

On March 18, 2008, the IGB brought four written charges against Gnutek and sought his discharge. [38-11]. The four charges were: "(1) receiving, removing, and releasing official and confidential IGB background files on the director of the Illinois State Police and an Official Action Request form for an ISP employee for non-work purposes; (2) failing to report that other IGB employees had the same documents; (3) attempting to access Pattara's emails without authorization; and (4) conducting three unauthorized audits and failing to submit required reports to his supervisor." [42] at 4 ¶ 7.

On March 28, 2008, the Illinois Department of Central Management Services (CMS) approved the charges (thereby approving Gnutek's discharge), and Gnutek was discharged. [38] at 3 ¶ 7; [38-11]; [42] at 4 ¶ 7. CMS is a state agency that enforces the personnel code and rules for state employees, including processing many personnel issues for the other agencies of the state. [42] at 9–10 ¶ 25. Agencies like the IGB typically make a decision to discipline or discharge an employee and send a request for that discipline to CMS for approval. *Id*. An agency

---

[3] The parties do not provide context for why this occurred. [42] at 3–4 ¶ 6.

cannot discharge an employee without CMS approval.  *Id.*  An employee may appeal CMS's decision to the Illinois Civil Service Commission.

Gnutek disputed the charges and appealed his termination to the Illinois Civil Service Commission.  [42] at 4–5 ¶¶ 7–8; [38-12].  On March 20, 2009, the Civil Service Commission, in a 3-2 decision, found that the written charges against Gnutek for discharge approved by CMS "ha[d] been proven," but also concluded that "given Gnutek's previous performance record that he exceeded expectations as a Revenue Senior Special Agent, lack of substantial prior discipline, and the absence of any evidence that Gnutek gained an advantage for his actions, the unique factual circumstances surrounding the discharge do not rise to the level which sound public opinion recognizes as good cause for the employee to no longer hold the position." [42] at 5 ¶ 8; [38-12] at 2.  The Commission decided that the proven charges warranted a 90-day suspension in lieu of discharge.  [38-12] at 3.[4]

Gnutek litigated the suspension (the Commission's decision) in the Circuit Court of Will County and the Illinois Appellate Court throughout 2010 and 2011. [42] at 5 ¶ 9.

Meanwhile and relatedly, on September 19, 2008, Gnutek and another IGB employee, Thomas Hobgood, filed in the Northern District of Illinois a lawsuit against the IGB, the Illinois Department of Revenue (IDOR), and six individuals, including Ostrowski (*Gnutek and Hobgood v. IGB et al*, No. 1:08-cv-05516 (N.D. Ill.) ("*Gnutek/Hobgood*").  [42] at 5 ¶ 10; [38-14].[5]  Gnutek brought a First Amendment retaliation claim against Ostrowski and four other individuals, alleging that on November 3, 2006, he filed his proposed amended complaint (in *Gnutek I*) alleging corruption at the highest levels of the state government, that in December 2006 he spoke out publicly against corruption within the State of Illinois and within the IGB, and that in retaliation, in December 2006, he was subjected to an unwarranted and abusive investigation, in the fall of 2007 he was suspended from his employment with the IDOR and the IGB, and that on or about March 27, 2008, his employment with the IDOR and the IGB was terminated.  *Gnutek / Hobgood*, No. 1:08-cv-05516, Dkt. 1.  Hobgood brought a Title VII retaliation claim against IGB and IDOR and a First Amendment retaliation claim against Ostrowski and four other individuals, alleging that Hobgood assisted Gnutek with *Gnutek I* and the proposed amended complaint, and in retaliation, Hobgood was investigated, suspended, and discharged.

---

[4] The Commission "did not find the respondent [Gnutek] to be a credible witness given his somewhat incredulous explanations for his actions and the inconsistencies in his testimony with that of other credible witnesses."  [38-12] at 3.  Also, the two dissenting commissioners believed that Gnutek's actions warranted discharge from his position with the State.  [38-12] at 4.

[5] As noted above, defendant Ostrowski was one of the individuals named as defendants in *Gnutek/Hobgood*.  [38-14].  Other than Ostrowski, none of the other individual defendants in *Gnutek/Hobgood* are parties to this suit.

The district court granted summary judgment for the defendants in *Gnutek/Hobgood*. Both Gnutek and Hobgood appealed to the Seventh Circuit. [42] at 5 ¶ 10.

While the appeal was pending, Gnutek settled his claims in *Gnutek/Hobgood*. On February 17, 2012, the Seventh Circuit dismissed Gnutek's appeal. *Id.*; [38-15] at 21. Gnutek returned to work at the IGB on February 16, 2012. [42] at 6 ¶ 11.

As to Hobgood, the Seventh Circuit reversed the summary judgment decision and remanded the case for trial. *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 644–48 (7th Cir. 2013). The Seventh Circuit reviewed the evidence Hobgood had presented and explained: "When viewed as a comprehensive whole, Hobgood's evidence easily supports a reasonable inference that he was the victim of a retaliatory witch hunt." *Id.* at 644. The Seventh Circuit concluded that there was a genuine dispute on whether defendants' stated reasons for discharging Hobgood were pretextual: "Taken together, [Hobgood's] evidence creates a genuine dispute about the sincerity of the Gaming Board's belief—in other words, whether the Gaming Board's stated reasons for taking action against Hobgood were pretexts. . . . When properly construed in Hobgood's favor, the evidence could support a jury finding that the defendants fixated on firing him, ignored evidence of his innocence, and circumvented investigatory safeguards to pursue a set of baseless charges because he had helped Gnutek sue the Gaming Board." *Id.* at 647–48.

On remand, Hobgood settled his claims before trial. [38-15] at 23.

## C.    Traffic Incident and Illinois State Court Proceedings

Turning to the incident precipitating the current lawsuit: On May 31, 2014, Gnutek was involved in an altercation with the driver of a pickup truck and trailer. [42] at 6 ¶ 13. Gnutek does not dispute that he was involved in an altercation with the truck's driver. *Id.*; [43] at 11.

Gnutek and the truck's driver both went to the Palos Heights Police Department on May 31, 2014 (shortly after the incident), Gnutek was arrested and charged with battery, the Palos Heights Police Department generated a police report shortly after the May 31, 2014, incident, and Gnutek was tried in a bench trial in state court on November 6, 2014.

Gnutek does not dispute that defendants saw the police report (generated shortly after the May 31, 2014, incident) and the transcript of the subsequent November 6, 2014, state court proceedings (bench trial) relatively soon after these events (the altercation and police report, and the bench trial) occurred.

Both the police report and the bench trial transcript are relevant to defendants' knowledge and motives, so for those reasons they are included in this discussion of the facts.

According to the police report (*see* [42] at 6–8 ¶¶ 13–16; [38-18] (police report and complaint)):

At the time (May 31, 2014), Gnutek was a passenger in his car, which was being driven by his teenage son. According to Gnutek, as Gnutek's son passed the truck, the truck's driver threw a beer bottle at Gnutek's car, breaking his taillight. Both cars stopped in the road, and Gnutek exited his car and approached the driver's side of the truck. An altercation occurred, and Gnutek left the scene.

Gnutek went to the Palos Heights Police Department to report the incident, including the damage to his car and the physical altercation. Gnutek informed the police that after he exited the car, he approached the driver's side window of the truck to ask about information for repairing his taillight. Gnutek said that as he was approaching, the truck's driver, while still seated in the truck, punched Gnutek in the face unprovoked through the open window, and when Gnutek tried to push the driver away, the driver bit Gnutek's hand. Gnutek said that he did not strike the driver.

The truck's driver also went to the Palos Heights Police Department and told a different version of events. The driver had sustained injuries to his face and chest; after seeing the injuries, the reporting police officer called for an ambulance. The driver reported that he did not throw anything at Gnutek's car; after passing the truck, the passenger door of Gnutek's car started opening while the car was moving; Gnutek's car eventually stopped in the road; the truck's driver stopped too; and after the vehicles stopped, Gnutek walked to the truck's driver's window, pushed it down as the driver was trying to roll it up, and began punching the driver in the face and chest. The reporting police officer noted that the injuries on Gnutek's hands appeared consistent with punching someone or something. Gnutek maintained that he did not hit the driver and that the blood on the driver's clothes must have been from the driver's bite to Gnutek's hand.

Gnutek was arrested and charged with battery. [42] at 8 ¶ 16. The police report attached photos of Gnutek's hand injury, the truck's driver's injuries, and the reported light damage to Gnutek's car. [38-18] at 5, 7–12.

Defendants summarize the police report in their statement of facts, [42] at 6–8 ¶¶ 13–16; in response, Gnutek either agrees without qualification, or in some instances, while he agrees that defendants' statements accurately summarize the police report, he states that his "version of events is different" and that to the extent defendants rely on the police report for the truth of the matter asserted, the report

is hearsay, [42] at 7–8 ¶ 15.  However, Gnutek does not offer a different version of events in his Local Rule 56.1 statement of additional facts.  In any event, as noted above, the police report is relevant to defendants' knowledge and motives, not for the truth of the matter asserted; thus under Fed. R. Evid. 801(c)(2), the report is not hearsay, and it may be considered at summary judgment.

The same day he was arrested (May 31, 2014, a Saturday), Gnutek called his direct supervisor at the IGB, Cobb (former defendant who was voluntarily dismissed), and informed him of the arrest.  [42] at 8 ¶ 17.  Cobb informed his supervisor, defendant Pattara, of Gnutek's arrest.  *Id.*  Pattara, in turn, notified his supervisors, defendants Ostrowski and Vega (former defendant who was voluntarily dismissed).  *Id.* at 8 ¶ 18.  Gnutek was placed on administrative leave on June 2, 2014.  *Id.* at 8 ¶ 20.

On November 6, 2014, at a bench trial in Illinois state court, Gnutek was found guilty of battery, a Class A misdemeanor.  *Id.* at 9 ¶ 21; [38-20] at 133-38 (bench trial transcript).

The judge specifically explained: "the police officer . . . may be the only person in the courtroom who told the exact truth."  [38-20] at 134.  The defendant is "a professional man, a very big strong man, who certainly could inflict bodily harm on somebody with a punch."  [38-20] at 134.  The judge found that "[w]hat this comes down to is credibility" because Gnutek and the victim offered different accounts.  [38-20] at 134.  The judge found that "if in fact what I saw is correct that something did get thrown at the car [Gnutek's car], Mr. Gnutek hit this person he thought was responsible twice.  I think that's what happened."  [38-20] at 135–36.  The judge found that aspects of Gnutek's account were "incredible to me."  [38-20] at 136.  The judge said, "[w]hat I think happened here was that after it happened that Mr. Gnutek realized, being an officer of the law based on the way I understand this or at least somebody who identifies himself as an officer of the law, that he made a mistake . . . ."  [38-20] at 136.  The judge explained, "I don't know whether or not the victim provoked this.  Maybe he did.  Maybe he didn't.  But this is so typical of people who get involved in these arguments on the street and extract a little street justice."  [38-20] at 136.  As to Gnutek's version, the judge found:

> [T]hat he [the victim] would sit in his vehicle and throw a punch at a guy this size [Gnutek] is incredible to me.  He [Gnutek] could have dragged him [the victim] out of the car and beat the hell out of him.  The victim in the case appears to be in his 60s.  The defendant is over six feet, is in great shape and looks like he weighs about 250 pounds.  Nobody in your right mind would take a swing at this guy while you are sitting down.  You can't generate speed when you are sitting down.

9

The idea that he [Gnutek] was looking down and he got punched in the face is not credible to me either. He had no business going back to that [the victim's] car. He is a law enforcement official. Somebody does something wrong he calls the police. But for 30 seconds he lost control.

For that reason he is going to be found guilty on the charge of battery.

[38-20] at 137–38.

After the finding of guilty, the court said, "Both of you come up here," and had an off-the-record conversation with those people; the record does not say who "[b]oth of you" was—the attorneys, Gnutek and the victim, all of them, or some of them. [50] at 2 ¶ 5; [38-20] at 138.

After the off-the-record conversation, the court went back on the record and explained that the case was going to be continued for a period of 90 days, at which point the judge would consider a motion to vacate the guilty finding. [50] at 2 ¶ 6; [38-20] at 138–39. The judge advised Gnutek that he needed to get a couple of things completed, advised him to do what his attorney instructed him to do, and said that "in three months we will see where you are." [50] ¶ 7; [38-20] at 139. Gnutek was required to go to counseling, pay the truck driver's medical expenses, and, if he did so, no conviction would be entered. [50] ¶ 3.

After the bench trial, Gnutek immediately contacted the IGB and advised the IGB that the judge "ruled that Gnutek was guilty of battery," but the judge "made some type of deferred adjudication under law that Gnutek can't explain because he's not a lawyer. As such, the guilty was [*sic*] verdict was stayed. Gnutek was ordered to go to the Union Employee Assistance Program for anger management counseling. Gnutek was ordered to pay [the truck's driver] insurance co-pay and for his time off of work in the amount of $2,000.00. The case was continued to March 11, 2015 under the condition that if Gnutek completes the counseling and pays the amount ordered the case will be dismissed. No finding of guilty will be entered." [50] ¶ 3; [42-1] at 71. This information was sent by email to Weathers, Pattara, and Ostrowski. [42-1] at 70–71.

The IGB obtained a transcript of the bench trial. [42] at 9 ¶ 22.

## D. Disciplinary Proceedings and Discharge

As noted above, Gnutek was placed on administrative leave on June 2, 2014. [42] at 8 ¶ 20; [50] at 1 ¶ 1. (This was shortly after the May 31, 2014, incident.)

On January 9, 2015 (after the November 6, 2014 bench trial), the IGB issued a memorandum to Gnutek that "[d]iscipline is being contemplated for the following" (i.e., included initial charges):

> On Saturday, May 31, 2014, you notified Trooper Charles Cobb that you were arrested for Battery by the Palos Police Department, due to a physical altercation with another individual . . . . On November 6, 2014, you appeared before Judge Michael J. Kane, and was [*sic*] found guilty of Battery, a Class A Misdemeanor." [38-23] at 2.

> Your conduct towards [the individual] and the conviction of Battery constitutes [*sic*] violations of the Illinois Gaming Board Employee Handbook dated July 1, 2009, Chapter 4: Rules of Conduct, Conduct Unbecoming an Employee and Convictions.

[38-23] at 2.

The memorandum attached the Rules of Conduct (Chapter 4 of the IGB Employee Handbook). [38-23] at 3–5.

The Rules of Conduct contain two relevant provisions, "Convictions" and "Conduct unbecoming an employee." [38-23] at 4. To provide complete context for these provisions, the court quotes them in full, emphasizing key portions:

<u>Convictions</u>

> You must immediately notify the Deputy Administrator for the Administrative Services Division when a conviction you incur following your starting date of employment with the department results in probation, a jail term, or the suspension or revocation of your driver's license. The requirement to notify the Deputy Administrator of Administrative Services also applies to any offense (other than a minor traffic violation) that results in a fine or restitution of $100 or more, excluding court costs, and other amounts added to the fine. *For purposes of this section, "convictions" include* all misdemeanors and felonies committed as an adult for which you plead guilty, *are found guilty*, are convicted, *or agreed to an alternative sentencing program or pretrial diversion program which required an admission, stipulation or finding of guilt, including court supervision and/or probation.* "Minor traffic violation" means any offense for which the range of possible penalties includes a fine only.

> If a connection exists between your conviction or punishment and your job duties, responsibilities, or fitness for duty, and you fail to comply

with the notification requirement set forth above, you may be subject to disciplinary action, up to and including discharge.

**Conduct unbecoming an employee**

*All contact with fellow employees and the public must be conducted in a manner that will not discredit the background, character, or integrity of any individual and will not cause discord with the public or fellow employees, disrupt official business, or endanger public safety.*

*"Conduct unbecoming" an employee includes that which tends to bring the agency into disrepute or reflects discredit upon him or her as a member of the agency or that tends to impair the operation, efficiency, or integrity of the agency or the employee.*

[38-23] at 4 (italics added).

The January 9, 2015, memorandum notified Gnutek that a pre-disciplinary meeting had been set for January 14, 2015. [38-23] at 2.

On January 14, 2015, the IGB held the pre-disciplinary meeting. [42] at 12 ¶ 32.

On approximately January 28, 2015, Gnutek submitted a written rebuttal. [42-1] at 68–69 (Gnutek contends, and defendants do not dispute, that the document was received on January 23, even though it was dated January 28, [50] at 3 ¶ 11; the exact date is immaterial). The written rebuttal made the following points in response to each of the two charges:

- On the charge of conduct unbecoming an officer, Gnutek contended that "he did not batter [the truck's driver] and that, while there was a confrontation, Mr. Gnutek was defending himself. Mr. Gnutek points directly to his testimony in the criminal proceeding. Mr. Gnutek states that it occurred exactly as is outlined in his testimony . . . . Mr. Gnutek paid Mr. Pruim $2,000 in restitution, completed anger management counseling and traffic school." [42-1] at 68.

- On the charge of being convicted, Gnutek contended: "Mr. Gnutek's view is that he has not been convicted. 730 ILCS 5/5-1-12 provides that a criminal judgment occurs when there is a finding of guilt and a sentence has been pronounced by the court. An annotated version of this provision of the Illinois Criminal Code is attached as Exhibit 1. The transcript makes it clear that the criminal case has been continued to March 11, 2015. As such, Gnutek doesn't believe that he has been convicted of anything. The case was

continued for a final ruling on a finding of conviction. Gnutek argues that he should be placed on suspension pending judicial verdict pursuant to 80 Ill. Admin. Code 302.785. That allows for Gnutek to be suspended, without pay, "pending a final court determination of innocence or guilt." [42-1] at 68.

On January 28, 2015, Gnutek wrote to Weathers to ensure that she had received his response. [50] at 4 ¶ 13. Weathers acknowledged that she had and indicated that Gnutek would remain on administrative leave "until the IGB determines what discipline will be imposed." [50] at 4 ¶ 13.

On February 2, 2015, Ostrowski sent Gnutek a letter (1) as a result of the pre-disciplinary meeting, suspending Gnutek without pay for up to 30 days pending the decision to discharge, effective Friday, February 27, 2015; (2) attaching the final charges that served as the basis of the action—the same charges of conduct unbecoming an employee and conviction, [42-1] at 64; and (3) stating that Gnutek would be notified in writing as to the decision concerning final disciplinary action. [42-1] at 63–64; *see also* [50] at 4 ¶ 14; [42] at 13 ¶ 34; [38-23] at 6.

Although the letter attaching the charges is dated February 2, 2015, [42-1] at 63, the attached charges give the date of the suspension pending discharge as February 3, 2015, [42-1] at 64.

Within weeks, CMS approved the charges, and the discharge was effective.

Specifically, according to CMS's documentation (the CMS Notice of the Approval of Written Charges by the Director of Central Management Services): The IGB's written charges seeking Gnutek's discharge were dated February 3, 2015, and CMS approved those charges (and thus Gnutek's discharge) on February 20, 2015. [38-24] at 2.

Gnutek's termination was effective February 27, 2015. [50] ¶ 23.

On April 29, 2015, the Illinois state court entered an order finding Gnutek not guilty on the battery charge. *Id.* ¶ 24.

Besides the sequence of events above, one aspect of the disciplinary process that the parties discuss is CMS's role in the process. The court discusses this issue in detail in the analysis below and ultimately concludes (for reasons explained below) that any dispute as to CMS's role raises no genuine dispute about pretext.

## II. Procedural History

Gnutek filed this suit on January 31, 2017. [1]. He alleged claims for retaliation in violation of Title VII against IGB (Count I), *id.* at 6; retaliation in

violation of the First Amendment and 42 U.S.C. § 1983 against the individual defendants, Mark Ostrowski, Karen Weathers, Isaiah Vega, Vincent Pattara, and Clinton Cobb (Count II), *id*. at 7; and violation of the Illinois Ethics Act as to the IGB and the individual defendants (Count III), *id*. at 9. (Gnutek named all individual defendants in their individual capacities, and also named individual defendants Ostrowski and Cobb in their official capacities for the purpose of seeking injunctive relief.)

Defendants moved to dismiss. [16]. The court granted the motion to dismiss as to Gnutek's claim for violation of the Illinois Ethics Act (Count III) against the IGB and individual defendants in their official capacities and denied the motion in all other respects (including, for Count III, the individual defendants in their individual capacities). [21]. Later, Gnutek voluntarily dismissed defendants Cobb and Vega. [31], [33].

The remaining defendants now seek summary judgment on the remaining claims. [37]. For the reasons below, defendants' motion is granted.

Thus, the remaining claims and defendants are as follows:

1. Count I, Title VII retaliation against the IGB;
2. Count II, First Amendment retaliation against Ostrowski, Weathers, and Pattara in their individual capacities (and against Ostrowski in his official capacity for the limited purpose of equitable relief); and
3. Count III, violation of the Illinois Ethics Act as to Ostrowski, Weathers, and Pattara in their individual capacities.

Defendants moved for summary judgment. [37]. The case was reassigned to this judge. [54].

## DISCUSSION

### I.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.*

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323. After a "properly supported motion for summary judgment is made, the adverse

party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation, internal quotation marks, and footnotes omitted). Construing the evidence and facts supported by the record in favor of the nonmoving party, the court gives the nonmoving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [the party's] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## II.    Analysis

### A.    Local Rule 56.1

Defendants' reply argues that plaintiff's response to defendants' Local Rule 56.1 statement fails to comply with Local Rule 56.1 because it contains numerous unsupported and extraneous factual assertions. [51] at 1–2. Defendants ask the court to disregard paragraphs 6, 7, 10, 26, 27, 29, and 36 of plaintiff's response to defendants' Local Rule 56.1 statement for failure to comply with Local Rule 56.1. *Id.* at 2. Additionally, defendants point out that plaintiff's response brief fails to comply with the local rules because it is 22 pages long and plaintiff did not seek leave of court to file an oversized brief. *Id.* at 2–3. Defendants also point out that plaintiff's brief on pages 3, 4, 5, 6, 16, 17, 20, and 21 cites evidence that is not contained in the record. *Id.* at 3. Specifically, defendants allege that plaintiff makes factual assertions based on deposition testimony in the *Gnutek/Hobgood* lawsuit and that those factual assertions are not properly set forth in either side's Local Rule 56.1 statements. *Id.* Defendants ask that this court disregard all of plaintiff's factual assertions that do not comply with Local Rule 56.1. *Id.*

Local Rule 56.1(b) requires that a party opposing a motion for summary judgment serve and file "a concise response to the movant's statement" containing "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon."[6]

Additionally, a party opposing summary judgment must file "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. Absent prior leave of Court, a respondent to a summary judgment motion shall not file more than 40 separately-

---

[6] Local Rule 56.1 was amended in February 2021, after the parties briefed the motion for summary judgment. The court has applied the version of the Local Rule in effect when the parties filed their briefs.

numbered statements of additional facts. All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Local Rule 56.1(b)(3)(C).

"A district court is entitled to demand strict compliance with such rules for responding to a motion for summary judgment . . . a court does not abuse its discretion when it opts to disregard facts presented in a manner inconsistent with the rules." *Fabriko Acquisition v. Prokos*, 536 F.3d 605, 607–08 (7th Cir. 2008). "When a nonmovant fails to adhere to Local Rule 56.1(b), the Court may admit the movant's Rule 56.1 Statement and disregard the nonmovant's submissions." *Prewitt v. United States*, Nos. 10 C 102, 11 C 3136, 2012 WL 5381281, at *1 (N.D. Ill. Oct. 31, 2012).

Local Rule 7.1 states: "Neither a brief in support of or in opposition to any motion nor objections to a report and recommendation or order of a magistrate judge or special master shall exceed 15 pages without prior approval of the court."

Gnutek's summary judgment briefing, [42], [43], does not comply with the local rules. First, some responses appear to contest defendants' statements but do not contain specific or adequate references to the record for supporting material, preventing the court from locating in the record any supporting material Gnutek may have intended to cite. *See* [42] ¶¶ 15, 37. Second and relatedly, some responses contain additional facts or arguments that would more appropriately have been included in Gnutek's statement of additional facts or summary judgment brief. *See, e.g.*, *id.* ¶¶ 5, 6, 10, 26, 27, 29, 30, 36. "It is inappropriate for a non-movant to include additional facts, meaning facts extraneous to the substance of the paragraph to which the non-movant is responding, in a Local Rule 56.1(b)(3)(B) response." *Johnson v. Cnty. of Cook*, Nos. 08 C 2138, 08 C 3648, 2012 WL 2905485, at *12 (N.D. Ill. July 16, 2012).

For example, in ¶ 6, defendants recite the procedural history of the *Gnutek II* litigation. That paragraph asserts that Gnutek filed *Gnutek II* on December 29, 2006, that he reasserted RICO allegations from *Gnutek I* against the same defendants, that Gnutek amended his complaint, that none of the current defendants were named in *Gnutek II*, and that plaintiff voluntarily dismissed the case. [42] at 3 ¶ 6. None of these assertions appear particularly difficult to admit or deny. However, instead of admitting or denying these allegations, Gnutek's response to ¶ 6 spans three paragraphs and contains additional factual allegations regarding the *Gnutek/Hobgood* litigation. At one point, Gnutek states that "[t]o understand the significance of Gnutek's RICO claims one can review the deposition testimony" of a witness in one of Gnutek's previous lawsuits. *Id.* ¶ 6. He then cites to 14 pages of deposition testimony from the *Gnutek/Hobgood* litigation without specifying what exactly in that deposition testimony controverts the defendants'

factual assertions in this paragraph. *Id.* This paragraph is an example of a response that does not conform to Local Rule 56.1.

Gnutek seems to suggest that he could not have complied with this court's local rules because defendants are mischaracterizing the record. Also, in his response to ¶ 6, he says that "there is a lot of context missing [from defendants' allegations]" and that "[t]his statement of fact highlights the difficulties associated with attempting to comply with the requirements of Local Rule 56.1(b)(3) that factual assertions be brief and straight forward [*sic*]." *Id.* ¶ 6. However, there is no reason why Gnutek could not have included these additional statements of fact in his own Local Rule 56.1 statement or elaborated in the briefing on how defendants have allegedly mischaracterized the record. There is also no reason why he could not competently dispute many of defendants' statement of facts with adequate citations to the record.

Third, Gnutek's response brief [43] is also oversized at 22 pages. Plaintiff did not seek leave of court to file an oversized brief. Additionally, as the court will discuss more in detail where appropriate, there are portions of the brief that cite facts not included in either side's Local Rule 56.1 statement. "Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion." *Perez v. Town of Cicero*, No. 06 C 4981, 2011 WL 4626034, at *2 (N.D. Ill. Sep. 30, 2011).

Gnutek's Local Rule 56.1 responses also copied and pasted the defendants' statement of fact but inexplicably omitted the defendants' citations to the record that the defendants had included in their statement. *Compare* [38] *with* [42]. While this does not explicitly violate the local rules, it has made reviewing Gnutek's response to the defendants' Local Rule 56.1 statement unnecessarily cumbersome.

"It is simply not a district judge's job in summary judgment cases to sift through the record and make the case for a party." *Hunt ex Rel. Chiovari v. Dart*, 754 F. Supp. 2d 962, 980 (N.D. Ill. 2010). Thus, "where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial," the court could "deem[ ] that statement of fact to be admitted." *Greene v. CCDN, LLC*, 853 F. Supp. 2d 739, 744 (N.D. Ill. 2011). The court could also disregard denials that contain new facts. *See id.* (disregarding denials that "although supported by admissible record evidence, do[] more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact"). The court could "disregard[ ] any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts." *Id.*

Nonetheless, it is preferable to address the arguments on the merits. Thus, despite the local rule issues, the court has evaluated the parties' arguments on the

merits to the fullest extent feasible given the filings and has considered Gnutek's points on the merits as best the court can, short of independently scouring the extensive record. Except as specifically noted below, the court has considered (and has not disregarded due to local rule issues) the facts as presented by the parties.

## B.     Count I: Title VII Retaliation against the IGB

Gnutek asserts that the IGB unlawfully retaliated against him in violation of Title VII due to his "history of opposing unlawful actions under Title VII." [1] ¶¶ 32–33. The IGB argues that summary judgment is proper on this claim because Gnutek cannot show that his termination was caused by his protected activity (*i.e.*, his previous lawsuits against the IGB). [39] at 5. In response, Gnutek contends that a jury could conclude that the altercation was not the real reason for his termination. [43] at 11.

Title VII prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one. 42 U.S.C. § 2000e–3(a); *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). A Title VII retaliation claim requires a showing that (1) the plaintiff engaged in statutorily protected activity and (2) suffered an adverse employment action (3) because of that statutorily protected activity. *Lord*, 839 F.3d at 563. The parties do not dispute that Gnutek engaged in statutorily protected activity or that Gnutek suffered an adverse employment action. [39] at 5. The parties dispute only the third element—causation.

"A [Title VII] retaliation claim requires proof of causation, which in this context means but-for causation." *Lord*, 839 F.3d at 563. "When confronted with circumstantial evidence of a retaliatory motive, the employer may show that the employee would have been fired even absent his complaints about harassment." *Id.* at 564. "Even if a plaintiff establishes a retaliatory motive, he must also demonstrate that the complained of action would not have occurred without the retaliatory motive. Retaliation does not exist if the complained of actions would have still occurred." *Lieberman v. Budz*, No. 03 C 2009, 2009 WL 1437609, at *14 (N.D. Ill. May 20, 2009).

"[A]n employer's proffered justifications are always susceptible to attack, and [a plaintiff] can avoid summary judgment if a material factual dispute exists on the question of pretext." *Lord*, 839 F.3d at 563. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is lie, specifically a phony reason for some action." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quotation marks omitted). "If a reasonable fact finder would be compelled to believe the [defendant's] explanation, then the [defendant] is entitled to summary judgment." *Id.* Put differently, "Does the record contain sufficient

evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?" *Lord*, 839 F.3d at 564.

In the context of a suspicious timing argument (and there is no apparent reason why the same principle would not hold true in the context of pretext more generally), significant intervening events can defeat any reasonable inference of causation. *See Young-Gibson v. Bd. of Educ. of City of Chicago*, 558 F. App'x 694, 699–700 (7th Cir. 2014) ("In light of these significant intervening events, a jury could not reasonably accept Young–Gibson's suspicious-timing argument.") (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (2012) ("[T]he evidence shows that [plaintiff]'s own aberrant actions or other intervening circumstances led to the negative responses."); *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011) (same)).

Here, even construing the facts in the light most favorable to Gnutek, no reasonable fact finder could conclude that Gnutek was discharged because of his previous litigation against the IGB (or any possible retaliatory motive stemming from that prior litigation). The only reasonable conclusion from the record is that Gnutek would have been discharged on the basis of the altercation and subsequent legal proceedings even absent his prior lawsuits against the IGB.

Gnutek contends that a jury could conclude that the IGB's reasons for his firing were pretextual. He points to five pieces of evidence or alleged disputes of fact that, he argues, taken together, indicate that the IGB's reasons for his discharge were pretextual, and would allow a jury to so conclude (as Gnutek describes it, "reasons why a jury could conclude that the IGB and the Individual Defendants are simply not being truthful with their explanations and, as a result, infer that the real reason was retaliatory," [43] at 12):

1. "First, the Defendants have not been honest about their actions. Knowing that CMS had to approve the discharge they falsely told CMS that Gnutek had been convicted when he had not. Further, they are now falsely claiming that it was actually CMS who made the decision to terminate." *Id.*

2. "Second, they have treated others who have engaged in far more serious misconduct much less harshly and have placed individuals who are clearly compromised in positions of significant trust." *Id.*

3. "Third, they have a history of retaliation, particularly one of retaliating against Gnutek." *Id.*

4. "Fourth, they have completely failed to comply with the Illinois Personnel Rules that govern how they are supposed to handle individuals who have been accused of criminal activity." *Id.*

5. "Fifth, the Illinois State Police declined to even conduct an investigation into this incident." *Id.*

The court addresses each of Gnutek's five arguments below. For organization and clarity, each of the five arguments is discussed separately. However, all the evidence must be considered together in deciding whether Gnutek has raised a genuine dispute that his discharge was retaliatory. Considering all the evidence as a whole, it does not raise such a dispute and summary judgment is therefore warranted.

Turning to the first of Gnutek's five arguments:

Gnutek says that the defendants "have not been honest about their actions." [43] at 12. Specifically, Gnutek contends that defendants knew that CMS had to approve the discharge and "falsely told CMS that Gnutek had been convicted when he had not." *Id.* Gnutek also contends that defendants "are now falsely claiming that it was actually CMS who made the decision to terminate" rather than defendants (IGB and its personnel). *Id.*

Addressing these two points in turn:

Gnutek argues that, throughout the disciplinary process, IGB, Ostrowski, and Weathers initiated, pursued, and submitted to CMS for approval charges that included the charge of conviction, when (according to Gnutek) defendants knew that in fact Gnutek had not been convicted and that the charge of conviction was unfounded. As Gnutek argues, defendants pursued the charge of conviction throughout the process—beginning with the initial charges given in Ostrowski's January 9, 2015, memorandum and extending through the final charges in Ostrowski's February 2, 2015, letter, which IGB submitted to CMS for approval with Ostrowski's approval. This was so despite Gnutek's initial email after the bench trial and Gnutek's written rebuttal after the pre-disciplinary meeting, both of which explained that (in Gnutek's view) Gnutek had not been convicted. Effectively, Gnutek argues, Ostrowski and Weathers misled CMS into believing that there was a conviction and obtained CMS's approval of the discharge before the final disposition (not guilty) occurred.

This argument is not persuasive, for various reasons.

For one, Gnutek's argument relies on the premise that "[u]nder Illinois law, the entry of the order on November 6, 2014, was not a conviction because no

sentence had been imposed." [43] at 14 (citing *People v. Salem*, 2016 IL App (3d) 120390, ¶ 45). This premise—that the November 6, 2014, finding of guilt was not a "conviction" under Illinois law—is debatable as a matter of Illinois law. The Illinois Supreme Court has explained that "the word 'conviction' is ambiguous" and "[d]epending on the context, the word 'conviction' can be reasonably construed to mean the date of sentence, or the date on which an adjudication of guilt was entered." *People v. Woods*, 739 N.E.2d 493, 495 (2000); *cf. United States v. Lloyd*, 184 F.3d 695, 697–98 (7th Cir. 1999) (stating, in 18 U.S.C. § 922(g)(1) case, that "Illinois would treat Lloyd as having been 'convicted' during the pendency of his probation" even though "defendant . . . may upon successful completion of probation (i.e. discharge and dismissal), have the conviction expunged"). The Illinois Appellate Court case Gnutek cites, *Salem*, involved the definition of "conviction" for the purposes of "impeachment of a defendant during a criminal trial," *Salem*, 2016 IL App (3d) 120390, ¶ 46—not the employment context.

Second and more importantly, the charges that IGB brought did not purport to incorporate the definition of "conviction" under Illinois law, but instead were based on the Rules of Conduct found in Chapter 4 of the IGB Employee Handbook. Those rules define "conviction" broadly: "For purposes of this section, 'convictions' include all misdemeanors and felonies committed as an adult for which you plead guilty, *are found guilty*, are convicted, or agreed to an alternative sentencing program or pretrial diversion program which required an admission, stipulation or finding of guilt, including court supervision and/or probation." [38-23] at 4 (italics added). Based on the bench trial transcript, it is beyond dispute that Gnutek was found guilty on November 6, 2014, despite the fact that the court later vacated the finding.[7] It is also undisputed that defendants obtained the bench trial transcript, so they knew of the finding of guilt.

It is true that defendants also would have known from the bench trial transcript that the finding of guilt could later be vacated, potentially at the next hearing in 90 days if Gnutek complied with the conditions set by the court. And in fact, on April 29, 2015, after Gnutek's discharge from the IGB, the state court did enter an order finding Gnutek not guilty on the battery charge. Nonetheless, the definition of "conviction" in the Employee Handbook Rules of Conduct does not exempt findings of guilt that are later vacated. Indeed, the definition specifically incorporates alternative sentencing programs and pretrial diversion programs that required a finding of guilt (even though any record may later be expunged, *cf. Lloyd*, 184 F.3d at 697–98). That language indicates that the Rules of Conduct definition

---

[7] Although this basis is not necessary to the court's holding since Gnutek was found guilty on November 6, 2014, the state court's finding of guilt also may have fallen within the separate language about diversionary programs that required a finding of guilt in the rules' definition of "conviction." [38-23] at 4 ("For purposes of this section, 'convictions' include all misdemeanors and felonies committed as an adult for which you plead guilty, are found guilty, are convicted, or *agreed to an alternative sentencing program or pretrial diversion program which required* an admission, stipulation or *finding of guilt*, including court supervision and/or probation.") (italics added).

was broad and covered a finding of guilt even though the finding could later be vacated.

A broad reading of the Rules of Conduct definition is also plausible given the employment context. The facts of this case illustrate why. Again, it is true that the finding of guilt was later vacated, presumably after Gnutek satisfied the conditions the judge imposed. But in making the finding of guilt, the judge found that (1) Gnutek had "lost control" in an altercation with a member of the public and (2) Gnutek's version of events, to which Gnutek had testified in court, was not credible given Gnutek's strength relative to the victim.[8] As a Gaming Senior Special Agent, Gnutek "was an armed peace officer and had daily interactions with members of the public while performing his investigations and law enforcement duties, which included performing regulatory tasks such as internal audits and investigations, coordinating surveillance, monitoring employees and the public for illegal activities like card counting, making arrests, performing criminal investigations of the staff and members of the public, processing and booking arrestees, and appearing in court." [42] at 6 ¶ 12. The IGB could reasonably include in its employee Rules of Conduct, and could reasonably enforce, a definition of "conviction" that encompassed the type of findings that the judge made about both Gnutek's role in the altercation and his credibility—even if the finding of guilt was later vacated. (For the same reasons, the judge's findings, about both Gnutek's role in the altercation and his credibility, make the separate charge that the IGB brought and CMS approved—conduct unbecoming an officer—legitimate beyond a doubt. For this reason alone, Gnutek cannot show a genuine dispute that the discharge was pretextual. But, even assuming for the sake of argument that Gnutek could survive summary judgment by showing a genuine dispute that the conviction charge was pretextual (without a showing that the conduct unbecoming

---

[8] Gnutek does not seriously contest the court's findings. He admits that he was involved in an altercation with a member of the public. [43] at 11; [42] at 6 ¶ 13. He does not appear to dispute that this altercation was violent, resulted in injury to the other driver, and that he was arrested and charged with battery. [42] at 7 ¶¶ 15, 16. While Gnutek's response states, without a supporting citation to the record, that his "version of events is different" from the version contained in the police report, *id*. at 7 ¶ 15, Gnutek provides no additional statement of facts in his own Local Rule 56.1 statement contesting the allegation that he engaged in a violent altercation with a member of the public and that this altercation resulted in injury to the other driver. In short, Gnutek effectively admits that he engaged in a violent altercation with the other driver and presents no additional facts contesting the court's findings.

Even if the court's findings were contestable (and there is no apparent reason why they would be), the issue here is not whether the findings were correct. Rather, the issue is whether there is any genuine dispute as to either defendants' knowledge of the court's findings or defendants' motives in seeking charges against Gnutek in light of the court's findings. There is no dispute that defendants knew of the findings, since defendants obtained the transcript. As to defendants' motives, for the reasons discussed in this section, the court's findings indisputably provide a legitimate basis for the charges and thus preclude any genuine dispute that defendants' motives were pretextual.

an officer charge was also pretextual), Gnutek has not identified a genuine dispute that the conviction charge was pretextual, for the reasons discussed in this section.)

Moreover, there is no evidence that defendants misled CMS as to the state or effect of the legal proceedings. There is a February 11, 2015, email from Weathers to a CMS employee telling the CMS employee that "Mark O. [Ostrowski] said that there is no final disposition document until after he is sentenced in March. I'm attaching a copy of the criminal disposition sheet, which reflects a finding guilt [*sic*] and was signed by the judge. You should have this in the packet (last page of the court documents). Let me know[.]" [42-1] at 61.[9] Gnutek argues that this email is misleading because Weathers did not tell CMS that Gnutek told IGB (and Ostrowski and Weathers) that ultimately he would not be convicted (as Gnutek told IGB immediately after the bench trial and again in his written response to the charges after the pre-hearing meeting). But the email does not support any reasonable inference that defendants misled CMS. Rather, the email accurately reflects the finding of guilt (which certainly occurred, based on the bench trial transcript) and expressly conveyed that there would be no final disposition document until after the sentencing in March.

Returning to Gnutek's second point, Gnutek contends that there is evidence of pretext because defendants are falsely shifting to CMS (rather than IGB and its personnel) the initial decision to discharge. Gnutek contends that defendants are now falsely claiming that CMS initially recommended discharge, when in fact IGB made the initial decision. For the reasons explained below, any dispute about CMS's role does not raise a genuine dispute that defendants acted pretextually.

First, by way of background and as noted above, CMS is a state agency that enforces the personnel code and rules for state employees. [42] ¶ 25. Agencies like the IGB typically make a decision to discipline or discharge an employee and send a request for that discipline to CMS for approval. *Id.* An agency cannot discharge an employee without CMS approval. *Id.*

Here, defendants contend that, after compiling documents and preparing a pre-discipline package, Ostrowski and Weathers (the IGB equal employment opportunity officer) referred the question of how to discipline Gnutek, including whether to discharge him, to CMS. [42] at 10 ¶ 26. (Defendants' account of this referral rests largely on Weathers's and Ostrowski's depositions, *see* [38] at 7–8 ¶¶ 25–31 (citing portions of Exs. 2 and 4, *i.e.*, [38-2] (Weathers Dep. Tr.) and [38-4] (Ostrowski Dep. Tr.)).

As to the timing of this referral, defendants do not provide an exact date on which this referral occurred; but defendants contend that "[t]his referral to CMS

---

[9] The parties have not cited in the record a copy of the criminal disposition sheet referenced in this email.

was made before IGB made its determination of what level of discipline to request for Plaintiff." [42] at 10 ¶ 26. (In defendants' Local Rule 56.1 statement, defendants also discuss this referral before they discuss the January 15, 2015, pre-disciplinary meeting, perhaps implying that defendants believe the referral occurred before the pre-disciplinary meeting.) Weathers testified at her deposition that although typically an agency makes a request to discharge, and then CMS reviews and approves (or does not approve) the request, here, IGB went to CMS before IGB made a decision. [38-2] at 12 (dep. p. 38:6–22). That occurred, Weathers testified, because "Mark [Ostrowski] wanted to have another set of eyes take a look at it. Before coming to a determination, let's go ahead and submit it – you know, whatever their recommendation would be." [38-2] at 12 (dep. p. 38:19–22).

As to what the referral involved: According to defendants, "Weathers spoke directly to an individual at CMS who was the deputy director of labor relations at the time and provided him with documents relevant to Plaintiff's arrest and employment. She did not indicate to the individual what discipline she thought was appropriate, but asked him to look at it and tell IGB what he thought." [42] at 10 ¶ 27. Defendants further contend that "Ostrowski did not communicate with anyone at CMS about Plaintiff's arrest and potential discipline for the arrest at any time before Plaintiff's termination," [42] at 11 ¶ 28; "Ostrowski did not have a conclusion in mind as to what discipline was appropriate before the pre-disciplinary history[10] on January 15, 2015," [42] at 11 ¶ 29; and "Ostrowski opted to ask for CMS's opinion because he determined that an independent evaluation of the discipline would be appropriate given Plaintiff's prior overturned termination and the related lawsuit," [42] at 12 ¶ 30. According to defendants, "CMS recommended that discharging Plaintiff was the appropriate discipline." [42] at 12 ¶ 31.

Regardless of any CMS recommendation that (according to IGB's version, described above) may have occurred before IGB decided to seek discharge, the IGB's final written charges seeking Gnutek's discharge, as well as CMS's formal approval of the IGB's written charges, occurred in February 2015. Specifically, Ostrowski's letter to Gnutek transmitting the final written charges was dated February 2, 2015, [42-1] at 63, and the attached written charges gave February 3, 2015, as the date of the suspension pending discharge, [42-1] at 64. And, according to CMS's documentation (the CMS Notice of the Approval of Written Charges by the Director of Central Management Services), the IGB's written charges seeking Gnutek's discharge were dated February 3, 2015, and CMS approved those charges (and thus Gnutek's discharge) on February 20, 2015. [38-24] at 2.

Gnutek disputes IGB's account (described above) of IGB seeking an advance recommendation from CMS. In Gnutek's view, IGB and its leadership and personnel (Ostrowski and Weathers) were determined to discharge Gnutek no matter what; Gnutek disputes that CMS made a recommendation to discharge

---

[10] This appears to refer to the pre-disciplinary meeting.

before IGB (Ostrowski and Weathers) had made a decision to discharge. Specifically:

- Gnutek contends that "[t]here is no documentation in the record to suggest that information was forwarded to CMS before a decision to discharge had been made by the IGB." [42] at 10 ¶ 26. However, Weathers testified at her deposition that, in seeking the advance recommendation, given the proximity between her office and CMS's office, she probably would have hand delivered a packet with relevant information to CMS. [38-2] at 12 (dep. p. 39:20–41:15).

- Gnutek also points to an email dated February 18, 2015, from Weathers to a CMS employee in which Weathers asks the CMS employee for an update on Gnutek's discharge packet so that she can share it with Ostrowski. [42-1] at 61.[11] Gnutek asks, "[i]f Ostrowski and Weathers knew beforehand that CMS was automatically going to terminate, why would they write this email?" [42] at 10 ¶ 26. Gnutek argues that "[t]he suggestion that it was CMS who made the recommendation is misplaced." *Id.* But as explained above, the formal approval process did not occur until February 2015; IGB sent the final written charges to Gnutek around February 2, 2015 and CMS approved the charges on February 20, 2015. Thus, the timing of these emails is fully consistent with defendants' timeline, in which IGB consulted with CMS sometime in advance of the formal approval process but then went through the formal process in February. For the same reason (IGB's having consulted with CMS in advance is fully consistent with IGB's and CMS's also conducting the formal process in February), a statement to the Illinois Department of Human Rights by John Terranovo, Deputy Director of Labor Relations for CMS, that the process begins when an agency comes to CMS with a disciplinary discharge packet, [42] at 11 ¶ 27; [42-1] at 34, also raises no inconsistency with defendants' timeline.

- Gnutek has no documentation to suggest that Ostrowski communicated with anyone at CMS about Gnutek's arrest and potential discipline for the arrest at any time before Gnutek's termination, but does point out that there were communications between Weathers and CMS and that those inquiries were based upon Ostrowski's requests. It is true that emails reflect that Weathers was communicating with CMS and keeping Ostrowski informed. [42-1] at 61.

---

[11] Similarly, emails between Ostrowski and Weathers on February 18 and 19, 2015 reflect Ostrowski and Weathers discussing the status of CMS's decision. Those emails reflect Ostrowski asking Weathers, "Any word from CMS?", Weathers responding that she "spoke with CMS, and [a particular CMS employee] signed off (approved) on the discharge request, and it is now being reviewed by one of the labor attorneys. I'm expecting a final decision by Tuesday . . . . I'll keep you posted," and Ostrowski responding "Ok thanks." [42-1] at 60.

While this demonstrates personal involvement by Ostrowski, it does not raise a genuine issue as to Ostrowski's motives.

In short, if defendants are right that they sought an advance recommendation from CMS, then there is no evidence of pretext.[12] If Gnutek is right that defendants did not seek an advance recommendation from CMS, then that establishes at most that defendants followed typical procedures (as they clearly did in February 2015 with the IGB issuing the final written charges and CMS then approving the charges); no reasonable inference of pretext could be drawn.

The court now addresses the remaining four arguments by Gnutek.

In the second argument, Gnutek contends in his brief opposing summary judgment that "[o]ther individuals who were in significant positions of trust and responsibility were treated differently." [43] at 16. He claims that "[i]n the *Gnutek/Hobgood* litigation much was made of two instances of individuals who had significant roles in the IGB whose integrity is clearly compromised." *Id*. at 16–17. He then details two instances of individuals who he claims had committed worse offenses and suffered less serious consequences than discharge. *Id*. He supports these assertions with direct citations to deposition testimony from the *Gnutek/Hobgood* litigation. *Id*. However, this portion of Gnutek's brief does not cite either his or defendants' Local Rule 56.1 statement and presents facts that are not asserted in either statement. *Compare* [43] at 16–18 *with* [42].

Again, "[u]nder settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion." *Perez*, 2011 WL 4626034 at *2. This rule is not a mere technicality; rather, if these additional facts had been presented in a statement of additional undisputed facts, that would have allowed defendants a proper opportunity to respond and properly presented the dispute or alleged dispute for the court. Since this portion of the brief does not comply with Local Rule 56.1, and the presentation directly hindered defendants' ability to respond and the court's ability to assess the issue on the basis of a properly developed record and arguments, the court disregards the factual assertions related to these other individuals. There is no properly presented evidence that other individuals were treated differently by the IGB so as to suggest that Gnutek's firing was retaliatory.

---

[12] Gnutek does not argue that seeking an advance recommendation from CMS would itself show pretext. Rather, Gnutek disputes that IGB sought such a recommendation from CMS and argues that IGB made the decision first. Even if Gnutek had argued that seeking an advance recommendation from CMS would show pretext, there is no reason to credit such an argument. Gnutek has not identified any law, rule, or policy prohibiting IGB from seeking such a recommendation.

Third, Gnutek argues that "[t]here has been a pervasive history of retaliation at the IGB – particularly as it relates to Gnutek." [43] at 18. He relies on the Seventh Circuit's decision in *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635 (7th Cir. 2013), and argues that the "*Hobgood* decision demonstrates that there was tremendous hostility directed at the RICO lawsuit and a jury in this case could certainly see that and find that hostility played a sizeable role in the decision to terminate Gnutek." [43] at 19.

Of course, Gnutek's significant history of highly contentious litigation against the IGB (in which Gnutek first alleged Title VII retaliation and then alleged corruption at the highest levels of state government, including at the IGB itself but extending beyond the IGB) is a reason to consider carefully whether summary judgment is indeed warranted. In many hypothetical sets of circumstances, different from the circumstances here, that significant litigation history could very well warrant denying summary judgment, as in *Hobgood*.

But this particular record presents the potentially rare circumstances where despite the very significant litigation history, no reasonable juror could find retaliation. Unlike in *Hobgood*, here there was not only a significant litigation history but also a significant intervening event (or events)—the altercation, bench trial, and finding of guilty on the battery charge (including the court's specific findings as to both Gnutek's role in the altercation and his credibility). As noted above, in the context of a suspicious timing argument, significant intervening events can defeat any reasonable inference of causation. *See Young-Gibson*, 558 F. App'x 694, 699–700 (7th Cir. 2014) ("In light of these significant intervening events, a jury could not reasonably accept Young–Gibson's suspicious-timing argument.") (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (2012) ("[T]he evidence shows that [plaintiff]'s own aberrant actions or other intervening circumstances led to the negative responses."); *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011) (same)). That is the case here.

Gnutek appears to be suggesting that his litigation history with the IGB is a dispositive fact warranting the denial of summary judgment. However, Gnutek cannot avoid summary judgment here solely by relying on his prior litigation history with the IGB and the *Hobgood* decision—he must competently present evidence in *this* lawsuit raising a material dispute of fact regarding the IGB's motives in discharging him in *this* instance. Gnutek has not pointed to any evidence indicating that he was fired because of his litigation history against the IGB rather than his conduct in engaging in a violent physical altercation with a member of the public and the judge's findings as to role and credibility.

Fourth, Gnutek contends that "[b]y initially placing Gnutek on administrative leave and not on a suspension pending judicial verdict the IGB and the Individual Defendants violated protocol and policies." [43] at 19. Specifically,

Gnutek claims that the defendants deviated from the Illinois Personnel Rules—rules promulgated by the Director of CMS.

The Personnel Rules contain separate provisions addressing (1) "Suspension Resulting From Arrest or Criminal Indictment/Suspension Pending Judicial Verdict," 80 Ill. Admin. Code 302, Section 302.785, and (2) "Administrative Leave," 80 Ill. Admin. Code 302, Section 302.795.

Section 302.785, "Suspension Resulting From Arrest or Criminal Indictment/Suspension Pending Judicial Verdict," provides:

a)  The arrest or criminal indictment of any employee may be grounds for suspension if the arrest or indictment and facts in support of either made known to the Director [of CMS]:

1)  resulted from an employee's conduct in the course of employment duties, including a failure to perform such duties, or

2)  occurred on or proximate to State premises and as a result of the employee's conduct thereon, or

3)  raises reasonable doubt concerning the employee's suitability for continued State employment in the present assignment or position.

b)  The Director shall under the circumstances set forth above, at the request of an agency, suspend an employee, without pay, pending a final court determination of innocence or guilt.

c)  The following shall control the suspension pending judicial verdict:

1)  An affected employee may be in jail, free on bond or in some other similar status at the time the suspension is imposed.

2)  The arrest or indictment of an employee shall be for State or Federal criminal or civil charges, or charges brought in a foreign country, which raise reasonable doubt concerning the employee's suitability for continued employment in the current position. Traffic violations are not sufficient cause for suspension except where the employee temporarily loses driving privileges if the license is a requirement for

work as contained in the job description or position classification specification.

3) Any proposed Suspension Pending Judicial Verdict requires approval by the Agency head or designee and will include a complete and detailed statement of the reason(s) for the suspension and a copy of any official document, such as charges, indictment or arrest record, which supports the suspension.

4) Such suspension shall have no designated expiration date, depending on the length of the initial judicial process. The suspension ends with the return of the employee to work, discharge or termination of employment. The Director shall notify the agency of the status of the suspension 12 months after the suspension is granted and each 12 months thereafter for the agency to determine the continuing validity of the suspension. This suspension will not be continued while the employee appeals an initial guilty verdict through higher courts.

5) A suspension pending judicial verdict will be submitted to the Director for approval and service. An approved Suspension Pending Judicial Verdict will be served on the employee in person or by certified mail, return receipt requested, to the employee's latest address of record. It will be the responsibility of the employee to notify the agency of any change of address.

6) Upon a finding of not guilty or the dismissal of the charges for any reason the employee, upon application, will be restored to the same or similar position classification in the agency and work location held at the time the suspension was issued. A similar position classification shall include:

A) the same position classification with different duties;

B) a successor position classification; or

C) a different position classification having related requirements and duties and the same salary or wage assignment.

7) The employee may or may not be entitled to back pay depending upon the circumstances surrounding a finding of not guilty or a dismissal of the charges. The Director shall make a final determination with respect to whether back pay shall be granted.

Section 302.795, "Administrative Leave," provides:

a) With the approval of the Director of Central Management Services, an agency head may relieve an employee from duty when extraordinary circumstances and the best interest of the agency and the State of Illinois will be served in doing so.

b) Circumstances warranting this leave must be of an extraordinary nature and are limited to those situations where no alternative means, such as suspension or temporary reassignment of an employee, will adequately protect the best interest of the agency and the State of Illinois.

c) Duration of an administrative leave shall be no longer than necessary to protect the best interest of the agency and the State of Illinois. The leave shall initially be for no longer than 60 calendar days, but may be extended for additional periods of time, not to exceed 60 days each, so long as necessary to protect the best interest of the agency and the State of Illinois.

d) Administrative leave shall not be used as an alternative to Suspension Pending Decision on Discharge or Suspension Pending Judicial Verdict pursuant to Section 302.710 and Section 302.785 of this Part.

e) Administrative leave shall not be allowed in lieu of vacation, sick leave, personal business leave or any other type of paid or unpaid leave when the other leave is appropriate, nor shall administrative leave be used to circumvent rules governing limits on other leaves available to an employee.

f) The agency will immediately provide the affected employee written notice of the administrative leave, and the agency will also immediately report any administrative leave to the Department of Central Management Services.

Gnutek argues that he was improperly placed on administrative leave instead of suspension pending judicial verdict. He argues that the Rules make it

clear and mandatory that "when an employee is arrested and that arrest and/or prosecution creates questions as to that employee's ability to perform his job duties, he is to be placed into the status of suspension pending judicial determination." [43] at 20; *see* Section 302.785(a)(3)-(b). He contends that the Rules expressly prohibit using administrative leave as an alternative to suspension pending judicial verdict. *See* Section 302.795(d). He argues that if he had properly been placed on suspension pending judicial verdict rather than administrative leave, he would have had an automatic right to be reinstated on a finding of not guilty (*see* Section 302.785(c)(6)). Ultimately, he argues, a jury could conclude that defendants' "deviation from the clear rules . . . was intended as a way to harm Gnutek's prospects of returning to work and infer a retaliatory intent as a result." [43] at 21.

Defendants respond that the Illinois Administrative Code gives the CMS Director the discretion and authority to decide to place an employee on either administrative leave or suspension pending judicial determination. [51] at 12 (citing Sections 302.785(a)-(c)(6), 302.795(a)). It is true that both sections refer to approval by the Director. *See* Section 302.785(c)(5), 302.795(a). However, that is also true of the charges that resulted in discharge. Just as the mere fact that CMS approves charges (initiated by the IGB) would not preclude a reasonable inference of retaliation by the IGB (so long as that inference has a basis in the record), so too the mere fact that CMS approves either administrative leave or suspension pending judicial determination (after initiation by the IGB) would not preclude a reasonable inference of retaliation by the IGB (again, so long as that inference has a basis in the record).

But here Gnutek has identified no basis in the record for such an inference. Gnutek's response to defendants' statements of fact and statement of additional facts, [42], cites Gnutek's written rebuttal to the charges where he suggested that he be placed on a leave of absence pending a judicial determination, [42] at 15 ¶ 12, but does not cite record evidence on how or why the particular decision was made to place Gnutek on administrative leave versus suspension pending judicial determination. Gnutek's brief cites Weathers's deposition and says: "Karen Weathers was asked about the reason for this decision and why Gnutek wasn't placed on a suspension pending judicial determination. While she acknowledges that the issue was likely discussed between her, Ostrowski, Pattarra [*sic*] and Vega, she has no real explanation as to why they deviated from the Personnel Rules. Her testimony was that they just needed to remove Gnutek ([Defendants'] Exhibit 2, Karen Weathers dep., p. 20-21)." [43] at 20 n.9. Citing Weathers's deposition directly in the brief (and in a footnote), as opposed to in the statement of facts, violates Local Rule 56.1; thus, the court could disregard this evidence. Even if the court were to consider this evidence, Weathers's testimony was that there was probably a discussion or conversation about that decision, but she did not recall those communications, [38-2] at 7–8 (dep. p. 20:7–20:22). Any inference of retaliatory intent from that testimony would not be reasonable but speculative.

Defendants also point to an email the day of the altercation and arrest, in which Ostrowski responded in the affirmative to a question whether for similar incidents in the past, he had placed IGB agents on administrative leave. [42-1] at 49. Further, Gnutek does not explain why, just as he was charged not only with conviction but also with conduct unbecoming an officer under the Employee Handbook Rules of Conduct, IGB (if CMS approved) could not have placed him on administrative leave in response to the underlying altercation (as opposed to placing him on suspension pending judicial verdict in response to the arrest). In the end, Gnutek's argument amounts to citations to provisions of the Personnel Rules without properly presented, nonspeculative record evidence of how the decision was actually made in this case (or how the rules are actually applied in practice by either IGB or CMS, which promulgates the rules). Without any evidence of the sort, there is no genuine dispute for the jury and any inference of retaliation would be purely speculative.

Finally, Gnutek argues that summary judgment is warranted because "[t]he Illinois State Police concluded that no investigation was warranted." [43] at 21. He points out that "[i]n *Hobgood* the Seventh Circuit made a point of outlining the fact that the IGB pursued him even after the Illinois State Police had stopped its investigation." *Id.* Gnutek's brief alleges that "Vega, an employee of the Illinois State Police assigned to the IGB, submitted the IGB's concerns to the Illinois State Police for investigation (Gnutek App. 49). On October 17, 2014, the Illinois State Police closed their investigation and refused to process the matter any further (Gnutek App. 74)." *Id.*

These facts were not included in either Gnutek's or the defendants' Local Rule 56.1 statements, so the court could disregard them. Even if the court were to consider these facts, Gnutek's reliance on *Hobgood* is again unpersuasive. In *Hobgood*, the IGB had asked the Illinois State Police (ISP) to investigate charges that Hobgood had illegally recorded an IGB employee while assisting Gnutek with his RICO lawsuit, and the ISP found no evidence to substantiate the allegations against Hobgood, 731 F.3d at 638–39, yet the IGB continued to pursue the allegations; "Ostrowski advocated an even more expansive set of charges, including a charge for illegally recording [the IGB employee], despite the State Police finding that no evidence supported the charge," *id.* at 640. Here, unlike in *Hobgood*, the ISP did not state that they found no evidence to substantiate the allegation of battery. Rather, the ISP wrote to Ostrowski (in the October 17, 2014, letter that Gnutek cites closing the investigation) that "[p]ursuant to our agreement, DII [the ISP's Division of Internal Investigation] will *refer this matter back to your agency to be investigated as you deem necessary.* DII will take no further action on the matter." [42-1] at 74 (emphasis added). And at the time of the October 17, 2014, letter by the ISP (after the police report but before the bench trial), it could hardly be said that there was no evidence to substantiate the allegation of battery.

For these reasons, no reasonable juror could conclude that Gnutek's termination was retaliatory. Summary judgment is granted for the IGB on Gnutek's Title VII retaliation claim.

## C. Count II: First Amendment Retaliation against Ostrowski, Weathers, and Pattara in Individual Capacities

Gnutek asserts Count II, First Amendment retaliation, against individual defendants Ostrowski, Weathers, and Pattara in their individual capacities (and against Ostrowski in his official capacity for the limited purpose of equitable relief).[13] He contends that the "Individual Defendants have engaged in a retaliatory witch hunt against Gnutek because he has spoken out on matters of public concern" in violation of the First Amendment, and he seeks damages. [1] ¶¶ 43–45.

To make out a prima facie case of retaliation, a public employee must show that "(1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in the employer's actions." *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). As with the Title VII retaliation claim, the parties dispute only the last element—causation.

At summary judgment, the plaintiff "must produce evidence that his speech was at least a motivating factor—or, in philosophical terms, a 'sufficient condition'—of the employer's decision to take retaliatory action against him." *Id.* at 965. "After the plaintiff makes that showing, 'the burden shifts to the defendant to show that the harm would have occurred anyway.'" *Milliman v. County of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018) (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 251–52 (7th Cir. 2012)). "Once a defendant produces evidence that the same decision would have been made in the absence of the protected speech, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Thayer*, 705 F.3d at 252. "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Id.* (quoting *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011)).

Plaintiff argues that the causation standards for Title VII and First Amendment retaliation claims are different. [43] at 9. He alleges that a First Amendment claim requires only a showing that protected conduct "was a substantial or motivating factor in the decision, not 'but-for'" causation." *Id.* However, as the cases cited above demonstrate, after a plaintiff makes a showing that his speech was at least "a motivating factor" in the employer's decision, the

---

[13] Since Ostrowski has left the IGB, the request for equitable relief (reinstatement) may be moot. But the parties have not briefed this issue. In any event, summary judgment is warranted on the claim.

defendant bears the burden of showing that the same decision would have been made in the absence of the protected speech. *Thayer*, 705 F.3d at 252. Once the defendant makes that showing, the plaintiff bears the burden of demonstrating that the employer's proffered reason was pretextual. *Id*. at 252–53.

Here, with respect to the actions of defendants Weathers and Pattara, Gnutek cannot make out a prima facie case that his previous speech was a motivating factor leading to his termination.

Weathers was not involved in Gnutek's prior litigation against the IGB. Weathers testified that she was not familiar with the existence or substance of Gnutek's prior litigation, although she was aware that there had been a prior lawsuit related to his previous discharge. [42] at 13 ¶ 36. Gnutek's response to the defendants' statement of facts agrees that Weathers testified she lacked knowledge regarding the previous lawsuits but asserts, without a record citation, that "Gnutek's complaints were published in newspapers across the State of Illinois" and so "[t]he suggestion that [Weathers] would not have been aware of the litigation is not plausible." *Id*. However, since defendants properly put forward evidence about Weathers's lack of knowledge, the burden is on Gnutek to identify specific evidence in response, and here the response amounts to speculation.

For Pattara, defendants' statement of facts states that Pattara was aware of Gnutek's lawsuits involving IGB; he knew that one involved a claim that Gnutek was not paid the same amount as a female agent and that one involved an individual named Monk, but he "was not aware of Plaintiff's RICO claim." *Id*. at 13 ¶ 37. Gnutek disputes this statement with the citation "See Gnutek sworn statement," but does not provide a record citation for the sworn statement, so defendants' statement is deemed admitted. *Id*.

Aside from these claimed disputes Gnutek raises in his response to defendants' Local Rule 56.1 statements—the presentation of which is deficient for the reasons given above—Gnutek does not provide any other statements of additional fact in his own Local Rule 56.1 statement of additional facts that would suggest that Weathers or Pattara were motivated to terminate Gnutek based on his prior litigation against the IGB. Gnutek has therefore not properly presented any evidence that could lead a reasonable juror to conclude that Gnutek's prior litigation was a motivating factor in either Weathers's or Pattara's actions leading to his termination.

It is true, as noted in the factual background earlier in the opinion, that Pattara was involved in the underlying events that were the subject of litigation in *Gnutek/Hobgood*; as noted above, one of the four 2008 IGB charges that Gnutek challenged in *Gnutek/Hobgood* was a charge of attempting to access Pattara's emails without authorization. But even if Gnutek had made a prima facie showing against Pattara (for the reasons just noted, based on Gnutek's sworn statement, or

for any other reason), the claim against Pattara could not proceed for the same reasons discussed immediately below with respect to Ostrowski (significant intervening events). The same would be true for any claim against Weathers; even if Gnutek had made a prima facie showing against Weathers, the claim against Weathers could not proceed for the same reasons discussed immediately below with respect to Ostrowski.

Ostrowski was a named defendant in the *Gnutek/Hobgood* litigation. [38-14]. Here, that might have been enough to allow a reasonable juror to conclude that Gnutek's previous litigation activity was a motivating factor for Ostrowski's actions in terminating Gnutek, *absent* the significant intervening events discussed above— the altercation, bench trial, and finding of guilty on the battery charge (including the court's specific findings as to both Gnutek's role in the altercation and his credibility). However, for the reasons discussed above with respect to the Title VII claim, these were significant intervening events. They offer so compelling a justification for Ostrowski's actions that they bring this particular record within the potentially rare set of circumstances where there is no reasonable inference that Ostrowski acted out of retaliation. For the same reasons the Title VII retaliation claim fails, Gnutek has not raised a genuine dispute where a reasonable jury could decide that Ostrowski's reasons for terminating Gnutek were pretextual.

Summary judgment is granted for the individual defendants on Count II, First Amendment retaliation.

### D.     Count III: Violation of Illinois Ethics Act against Ostrowski, Weathers, and Pattara in Individual Capacities

Gnutek contends that his prior litigation history is protected activity under the Illinois Ethics Act and that the individual defendants retaliated against him for "speaking out on matters protected by the Ethics Act." [1] ¶¶ 49, 52. Gnutek brings this claim as to Ostrowski, Weathers, and Pattara in their individual capacities.

The Illinois Ethics Act states, as relevant: "An officer, a member, a State employee, or a State agency shall not take any retaliatory action against a State employee because the State employee does any of the following: (1) Discloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of any officer, member, State agency, or other State employee that the State employee reasonably believes is in violation of a law, rule, or regulation." 5 ILCS 430/15-10(1). The Act further provides: "A violation of this Article may be established only upon a finding that (i) the State employee engaged in conduct described in Section 15-10 and (ii) that conduct was a contributing factor in the retaliatory action alleged by the State employee. It is not a violation, however, if it is demonstrated by clear and convincing evidence that the officer, member, other

State employee, or State agency would have taken the same unfavorable personnel action in the absence of that conduct." *Id*. § 15-20.

"Although the Ethics Act is a state statute and its interpretation is a matter of state law, the Illinois Supreme Court and Illinois appellate courts have not interpreted the provisions of the Ethics Act . . . . When there is an absence of Illinois case law interpreting an Illinois statute, a court may look for guidance to federal cases interpreting an analogous federal statute." *Hosick v. Chicago State Univ. Bd. of Trustees*, 924 F. Supp. 2d 956, 974 (N.D. Ill. 2013). *Hosick* analyzed the anti-retaliation provision of the Illinois Ethics Act as analogous to Title VII's anti-retaliation provision. *See id.*; *cf. Costello v. BeavEx Inc.*, No. 12 C 7843, 2013 WL 2156052, at *2 (N.D. Ill. May 17, 2013) ("However, if there is an absence of Illinois decisions dealing with a particular labor law issue, federal decisions dealing with a substantially similar law, while not controlling, may be helpful and relevant." (internal quotation marks omitted)). Under this approach, if an employee makes out a prima facie case of retaliation, the employer must demonstrate that the same action would have taken place even in the absence of the protected conduct. *Hosick*, 924 F. Supp. 2d at 976.

This approach is consistent with the plain text of the Illinois Ethics Act. The Act provides that there is no violation "if it is demonstrated by clear and convincing evidence that the officer, member, other State employee, or State agency would have taken the same unfavorable personnel action in the absence of that conduct." 5 ILCS 430/15-20. Of course, at the summary judgment stage, the evidence must be viewed through the lens of the summary judgment standard; in other words, the question is not whether the showing described in the statute has definitively been made, but whether there is a genuine dispute of material fact warranting a jury trial on the issue.

Here, again, the altercation with a member of a public by an armed peace officer, the bench trial, and the finding of guilty on the battery charge (including the court's specific findings as to both Gnutek's role in the altercation and his credibility) so compellingly justified defendants' actions that they clearly and convincingly demonstrate that Gnutek would have been discharged regardless of his prior litigation. For the same reasons the Title VII and First Amendment retaliation claims cannot proceed, Gnutek has not raised a genuine dispute regarding the reasons for his termination. A reasonable juror could only conclude that Gnutek's discharge was due to his conduct in engaging in a violent altercation with a member of the public and the subsequent court findings.

The defendants also argue that the Illinois Ethics Act claim against them is barred by sovereign immunity. [39] at 11. However, the prior judge already determined that sovereign immunity barred an Illinois Ethics Act claim against the

IGB but not the individual defendants in their individual capacities. [20]. The court declines to address this issue again.

Summary judgment is granted on Count III as to Ostrowski, Weathers, and Pattara in their individual capacities. This count was previously dismissed as to the IGB and the individual defendants in their official capacities. [21]. Thus, the grant of summary judgment as to the individual defendants in their individual capacities results in the dismissal of the rest of Count III.[14]

## CONCLUSION

Summary judgment is granted for the IGB on Count I and the individual defendants on Counts II and III. There are no remaining claims or defendants. The case is dismissed with prejudice. Final judgment will enter.

Date: January 19, 2022    /s/ Martha M. Pacold
             United States District Judge

---

[14] Plaintiff states in a footnote that "Defendants do not seek summary judgment as to Vega." [43] at 1 n.1. However, plaintiff moved to voluntarily dismiss Vega from this action, and Vega was dismissed accordingly on July 6, 2018. [33]. The other individual defendant, Charles Cobb, was also voluntarily dismissed on June 13, 2018. [31]. Thus, the court's decision does not address those two former defendants.